## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| **VERNA BEATRICE HARTFIELD,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Action No. 2:16cv431** |
| : | |
| **CAROLYN W. COLVIN,** : | |
| **Acting Commissioner,** : | |
| **Social Security Administration,** : | |
| : | |
| **Defendant.** : | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Verna Hartfield's ("Ms. Hartfield") complaint filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner"), denying Ms. Hartfield's claim for Disability Insurance Benefits ("DIB") under the Social Security Act. Ms. Hartfield filed Motions for Summary Judgment or, Alternatively, for Remand, ECF Nos. 7-8, and Defendant filed a cross-motion for summary judgment, ECF No. 10, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Ms.

Hartfield's Motions for Summary Judgment or, Alternatively, for Remand, ECF Nos. 7-8, be **DENIED**, the Defendant's Motion for Summary Judgment, ECF No. 10, be **GRANTED**, the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## I. PROCEDURAL BACKGROUND

On August 2, 2012, Ms. Hartfield initially filed her application for DIB, alleging disability due to degenerative disk disease (DDD) with an onset date of December 1, 2011. R. at 36.[1]  Her application was initially denied on November 27, 2012, and again denied upon reconsideration on August 9, 2013.  *Id.*  Ms. Hartfield then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on August 13, 2014.  *Id.*  The ALJ, Judge William T. Vest, Jr., issued a decision denying Ms. Hartfield's DIB application on November 18, 2014.  *Id.* at 33.  On December 15, 2014, Ms. Hartfield filed a request with the Appeals Council to reconsider Judge Vest's decision.  ECF Nos. 9 and 11.  On May 12, 2016, the Appeals Council denied Ms. Hartfield's request for review because the ALJ's decision was supported by substantial evidence and Ms. Hartfield's claims did not warrant review, making the ALJ's decision the Commissioner's final decision.  *Id.* at 1-6.

Having exhausted her administrative remedies, Ms. Hartfield filed the instant complaint for judicial review of the Acting Commissioner's decision on July 12, 2016.  ECF No. 1.  The Acting Commissioner filed an Answer on September 13, 2016.  ECF No. 3.  The matter was referred to the undersigned U.S. Magistrate Judge on September 15, 2016.  ECF No. 5.  Ms. Hartfield filed her Motion for Summary Judgment on October 19, 2016, ECF No. 7, and the

---

[1] "R." refers to the certified administrative record that was filed under seal on August 19, 2015, pursuant to Local Civil Rules 5(B) and 7(C)(1).

Acting Commissioner filed a Cross-Motion for Summary Judgment and a Memorandum in Support on November 18, 2016, ECF Nos. 10-11.

## II. RELEVANT FACTUAL BACKGROUND

In her application, Ms. Hartfield alleged her disability onset date was December 1, 2011. R. at 36. Ms. Hartfield was 52 years old at the time of her disability onset and had previously suffered back pain and tenderness. *Id.* at 38, 43. At the administrative hearing on August 13, 2014, Ms. Hartfield and a vocational expert testified before the ALJ. *Id.* at 36.

On January 15, 2009, Ms. Hartfield visited Sentara Bayside ER complaining of back pain radiating down her left leg. *Id.* at 396. Her examination revealed straight leg raising on the left, and she was diagnosed with back strain and lumbar discogenic pain syndrome. *Id.* at 399. The physical exam did not show any musculoskeletal tenderness or abnormal muscle tone or coordination, however, Ms. Hartfield's distress was noted and pain assessment upon discharge was recorded at 8 out of 10. *Id.* at 397-399. She was prescribed medications to treat her pain, *id.* at 402, and discharged with instructions to follow up with a primary care doctor. *Id.* at 407. Ms. Hartfield again visited Sentara Bayside ER on February 17, 2009, with similar symptoms, diagnosis, and treatment. *Id.* at 427, 432. She was instructed to follow up with Atlantic Orthopaedic Specialists. *Id.* at 439.

On October 10, 2009, Ms. Hartfield once again visited Sentara Bayside ER for lower back pain after lifting heavy boxes at work. *Id.* at 472. She was diagnosed with lumbar radiculopathy, prescribed pain medication and a muscle relaxant, and was instructed to follow up with Atlantic Orthopaedic Specialists. *Id.* at 474, 477, 483. On October 22, 2009, Ms. Hartfield visited Atlantic Orthopaedic Specialists after being referred twice by Sentara Bayside ER. *Id.* at 315, 439, 483. Upon examination, she exhibited "tenderness in the left sided paraspinal muscles

3

at the thoracolumbar junction," but her doctor did not observe any other abnormalities in her exam or x-ray. *Id.* at 315. On November 16, 2009, Ms. Hartfield again visited Sentara Bayside ER for back pain. *Id.* at 489. Her examination revealed tenderness, a minimal spasm, and possible costovertebral angle tenderness. *Id.* Ms. Hartfield was diagnosed with "Chronic mid back pain, flank pain. Acute on chronic pain or new pain related to UTI, renal colic." *Id.*

Seven months later, on June 29, 2010, Ms. Hartfield again visited Sentara Bayside ER after feeling pain in her back and down her right leg after an incident at work. *Id.* at 529. She had "a decreased range of motion, tenderness . . . and pain." *Id.* at 532. She returned to the ER the next day complaining of worsened pain in her back and that the medications were not effective. *Id.* at 544. Her examination results and treatment were similar to the previous day. *Id.* at 549-550. Ms. Hartfield then followed up with Atlantic Orthopeadic Specialists again on July 9, 2010. *Id.* at 314. Her x-ray showed disc space narrowing at L5-S1 and "suggestion of spina bifida occulta." *Id.* The orthopedist recommended that Ms. Hartfield obtain an MRI. *Id.*

Nine months later, on April 12, 2011, Ms. Hartfield sought treatment at Sentara Bayside ER. *Id.* at 588. She was diagnosed with lumbar sprain and strain after complaining of back pain that radiated down her left leg after experiencing pain at work. *Id.* During examination, she showed tenderness over the left buttock, but a normal range of motion. *Id.* at 590. Two days later Ms. Hartfield visited Patient First—Newtown. Id. at 288. She exhibited "[s]traight leg raise significant for increased nonradiating low back pain," but did not exhibit any tenderness. *Id.*

Ms. Hartfield returned to Atlantic Orthopaedic Specialists on May 5, 2011. *Id.* at 313. Her report remarked that she did not go through with the MRI recommended at her last visit because she is "severely claustrophobic." *Id.* Her examination showed "negative straight leg

4

raising bilaterally." *Id.* Her doctor recommended "a steroid taper in combination with physical therapy . . . [and] placed her on light duty with essentially no repetitive bending or twisting and no lifting over five to 10 pounds." *Id.* Ms. Hartfield began a course of physical therapy on June 9, 2011, at Haygood Physical Therapy. *Id.* at 325. Her report from her physical therapy sessions showed continued pain, but included an assessment from Ms. Hartfield stating, "Feels like I am getting better each day. My back and L hip were sore after treatment yesterday but I feel less pain. The low back is tight on the L side. My boss wants me to have a back brace." *Id.*

Plaintiff continued physical therapy and by July 8, "continue[d] to improve, show[ed] decreased pain and increased ROM. . . . had no discomfort with any exercises [and planned] to return to work with full days next week." *Id.* at 332. On August 1, 2011, Ms. Hartfield visited Sentara Bayside ER for further back pain. *Id.* at 600. Her doctor observed normal range of motion bilateral lumbar paravertebral muscle tenderness and bilateral sacroiliac area tenderness. *Id.* She was prescribed pain medication and a muscle relaxant. *Id.*

On January 26, 2012, Ms. Hartfield visited Maria Salumbides, M.D., for back pain, nausea, and vomiting. *Id.* at 729-30. Dr. Salumbides noted in a review of her musculoskeletal system that she was positive for back pain and in a review of her neurological system that she was positive for slight weakness, had headaches earlier in the day, and was negative for dizziness. *Id.* at 730. Dr. Salumbides did not prescribe Ms. Hartfield any medication for her back pain. *Id.* Ms. Hartfield again visited Dr. Salumbides on March 30, 2012, for mild lower back tenderness and vomiting. *Id.* at 694-695. Dr. Salumbides prescribed medication for her back pain and vomiting. *Id.* at 695. When reviewing her musculoskeletal system, Dr. Salumbides noted Ms. Hartfield was positive for back pain and when reviewing her neurological system, she was negative for tingling, sensory change and focal weakness. *Id.* Dr. Salumbides

also noted Ms. Hartfield had negative straight leg raising bilaterally as well as a normal gait, coordination and muscle tone. *Id.* at 696.

On April 3, 2012, Ms. Hartfield sought treatment from Michael G. Charles, M.D., for nausea and dyslipidemia. *Id.* at 697. Dr. Charles examined her neurological and musculoskeletal systems and only noted that she was positive for back pain. *Id.* at 698. Dr. Charles diagnosed Ms. Hartfield with degenerative disc disease (DDD), lumbar region; elevated blood sugar; high cholesterol; degeneration of lumbar or lumbosacral intervertebral disc; other abnormal glucose; and pure hypercholesterolemia. *Id.* at 712.

On July 8, 2012, Ms. Hartfield went to the Emergency Room at Chesapeake General Hospital because she was experiencing back pain after moving from Virginia Beach, Virginia to Chesapeake, Virginia. *Id.* at 679. Her neurological examination was unremarkable and her musculoskeletal examination revealed "diffuse tenderness over the lumbosacral regions, mainly on the right side." *Id.* at 680. Ms. Hartfield was prescribed pain medication and a muscle relaxant, and was instructed to follow up with her primary care physician. *Id.*

Ms. Hartfield was seen again at the Chesapeake General Hospital ER on October 4, 2012. *Id.* at 744. The hospital noted her history of back pain stemming from a work incident in 2009. *Id.* Her neurological examination was again unremarkable and her musculoskeletal examination showed normal stance and gait as well as limited range in back motion and mild tenderness over the lumbar spine. *Id.* at 745. She was prescribed pain medication for temporary relief and instructed to follow up with an orthopedic doctor for further pain management. *Id.*

On November 7, 2012, Ms. Hartfield followed up with Dr. Charles. *Id.* at 791. Dr. Charles assessed her DDD and noted that there were no significant changes in her condition and that her neurological and musculoskeletal exams were unremarkable. *Id.* During Ms. Hartfield's

visit, Dr. Charles filled out a disability form for her where he evaluated how her medical condition would affect her ability to work during an eight-hour workday. *Id.* at 754-61. He determined that Ms. Hartfield could sit for one hour, then stand for one hour; needed to get up every ten minutes when sitting; could move for ten minutes before sitting again; and could occasionally lift up to ten pounds. *Id.* Ms. Hartfield sought treatment from Dr. Charles on February 11, 2013. *Id.* at 781. Ms. Hartfield's neurological and musculoskeletal exams were unremarkable besides lower back pain. *Id.* Dr. Charles prescribed her pain medication and noted that Ms. Hartfield was experiencing pain after sitting for thirty minutes. *Id.*

Beginning in March 2013, Ms. Hartfield participated in physical therapy at Southeastern Physical Therapy. *Id.* at 820-23. Southeastern reported that Ms. Hartfield "made significant improvements in mobility, endurance and strength." *Id.* at 820. She also was "making steady progress with aquatic therapy" and showed a slight improvement in her gait pattern. *Id.* at 821. Ms. Hartfield was discharged from physical therapy sessions per her request. *Id.* at 820.

Ms. Hartfield was seen by Mabel Humphreys, N.P., on April 2, 2013, and April 8, 2013 for back pain. *Id.* at 763, 772. On April 2, 2013, Ms. Hartfield "report[ed] her back continue[d] to ache." *Id.* at 772. N.P. Humphreys examined her musculoskeletal and neurological systems and noted she was positive for myalgias, but that her gait was normal. *Id.* at 773. On April 8, 2013, Ms. Hartfield told N.P. Humphreys she was "feeling better" and that "her pain is resolved in her back since previous visit." *Id.* at 764. The musculoskeletal and neurological examinations N.P. Humphreys performed were unremarkable and Ms. Hartfield presented with a normal gait and range of motion. *Id.* at 764-65.

Dr. Charles completed a second disability form on March 31, 2014, where he opined that Ms. Hartfield could sit for zero to one hour; could stand or walk for zero to one hour in an eight-

hour workday; could lift or carry five pounds occasionally; and had moderate limitations with using her right hand to grasp, turn, or twist objects, and with performing fine manipulations. *Id.* at 798-805. Lastly, Ms. Hartfield was seen twice in August 2014 for her back pain, among other conditions. *Id.* at 848, 852.

At the administrative hearing, Ms. Hartfield testified that she injured her back in May 2011 when she was working as a cashier and bent over to lift an item. *Id.* at 54. Ms. Hartfield stated that her medications and physical therapy did not help her with pain relief. *Id.* at 60, 63. She also said that she used a cane for support when walking outside of her home, but that it was not prescribed for her. *Id.* at 61, 66. Ms. Hartfield testified Dr. Charles prescribed her medication, did not recommend surgery, and "said nothing could be done" about her condition. *Id.* at 64. Further, Ms. Hartfield testified that although her husband performed most of the housework and driving, she could cook using a NuWave, wash clothes, load the dishwasher, drive, watch television, and shop for food. *Id.* at 61-62. Ms. Hartfield said that her husband helps her put on her shoes and clothes and get in and out of the shower. *Id.* at 62.

Ms. Hartfield also testified that she could only lift five pounds and sit up for fifteen minutes before needing to lie down and although she tried to return to work on light duty, she could not do so because of her back pain. *Id.* at 55-56, 63. Ms. Hartfield stated that after December 2011 she believed her condition had worsened to the point that she could no longer work as her employer did not have any light duty work for her. *Id.* at 56-57. Furthermore, the vocational expert testified that a person of Ms. Hartfield's age, education, and experience could perform past relevant work as a thrift store cashier, fast food crew person, or fast food manager that have given her "management skills, which would include supervisory, skills of employees, scheduling, some inventory skills, communication skills, report writing and record keeping,

some cashiering, money handling skills, and some problem resolution skills." *Id.* at 72-73. The expert also stated that Ms. Hartfield could work in the light occupations of office helper, information clerk, and laundry folder. *Id.* at 72.

## III.  THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v.*

*Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that Ms. Hartfield[2] met the insured status requirements of the Social Security Act through December 31, 2016, and that she has not engaged in substantial gainful activity since December 1, 2011, which is the alleged onset date of disability. R. 38. Second, the ALJ determined that Ms. Hartfield has a severe impairment in degenerative disc disease ("DDD"). *Id.* The ALJ explained that this impairment is severe because it "causes more than minimal functional limitations and negatively affects the claimant's ability to perform the normal demands of work." *Id.* at 39. Although the record evidences a history of a seizure disorder, Ms. Hartfield has not taken medication for it since 2009 so the ALJ found that it is not a severe impairment since "there is no support for finding that seizure disorder causes more than minimal functional limitations and negatively affects her ability to perform the normal demands of work." *Id.*

Third, the ALJ concluded that Ms. Hartfield "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* The ALJ made this finding by determining that Ms. Hartfield's "severe back impairment lacks the degree of severity required" as the evidence failed to show "that her back disorder causes compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by a neuro-anatomic distribution of pain with functional loss, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and/or positive straight-leg raising tests." *Id.*

---

[2] Although the ALJ's opinion refers to the claimant as Ms. Hartfields, the undersigned uses the spelling of her last name in the complaint.

Fourth, the ALJ found that Ms. Hartfield possesses the residual functional capacity ("RFC") necessary to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following limitations: she "cannot climb ladders or perform work at unprotected heights or around dangerous machinery"; and she cannot crawl but "can engage in occasional stooping and/or squatting." *Id.* at 40. The ALJ then concluded that despite Ms. Hartfield's medical impairments and symptoms, her statements concerning the "intensity and persistence of symptoms" are not "fully credible." *Id.* at 41. The ALJ found that despite Ms. Hartfield's complaints, "[h]er activities of daily living are extensive and certainly not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" as "she drives, shops, does some housework, and watches television." *Id.* In addition, although she uses a cane, the cane was not prescribed to her by a doctor. *Id.*

The ALJ also noted that Ms. Hartfield "has not generally received the type of medical treatment one would expect for a disabled individual" because her February 11, 2013 records showed she last saw an orthopedist in 2010, she has not had back surgery, and "there is no evidence of inpatient treatment since the alleged disability onset date." *Id.* Further, the ALJ found that Ms. Hartfield's credibility was "undermin[ed]" by "the discrepancy between her testimony regarding physical therapy" that therapy had not helped and her March 29, 2013 physical therapy records showing "she had been making steady progress in aquatic therapy and displayed improvement in her gait pattern." *Id.* The ALJ also noted that Ms. Hartfield's "symptomology was not as significant and limiting as alleged in connection with this application" because on April 8, 2013, N.P. Humphrey's progress note said she was "feeling better" and that "her pain was resolved in her back since her previous visit", and when she

discharged herself from physical therapy, her April 10, 2013 discharge summary said she had "significant improvements in mobility, endurance and strength." *Id.* at 41-42.

Moreover, the ALJ gave "little weight" to the November 7, 2012 questionnaire completed by Dr. Charles that stated Ms. Hartfield "could sit for one hour and stand and/or walk for one hour, as well as only occasionally lift five to 10 pounds." *Id.* at 42. The ALJ determined this given that Ms. Hartfield's physical exam on July 8, 2012 showed only a positive musculoskeletal finding over her lumbosacral region and that she had "intact sensation and equal and symmetric motor strength in her upper and lower extremities" as well as "equal and symmetric bilateral grip strength." *Id.* Likewise, "on October 4, 2012, despite her allegation of generalized low back pain and constant aching, her stance and gait appeared normal", "[h]er strength was intact bilaterally" and "[t]here was only mild tenderness over the lumbar spine and she had full range of motion in her neck and in her upper and lower extremities." *Id.*

The ALJ also gave "little weight" to Dr. Charles' March 2014 multiple impairment questionnaire stating that Ms. Hartfield "could sit for 0 to one hour and stand and/or walk for 0 to one hour, as well as only occasionally lift 0 to five pounds." *Id.* The ALJ found that Dr. Charles "provided no rationale for lowering the claimant's functional capacity from his prior assessment and his opinion has no support from substantive medical evidence of record" as the record showed Ms. Hartfield was "feeling better" on April 8, 2013, her pain was resolved, she had normal ranges of motion, a normal gait, she discharged herself from therapy, and her discharge summary noted "significant improvements in mobility, endurance and strength." *Id.* Lastly, the ALJ gave "little weight to the physical assessments of the State agency medical consultants" whose physical assessments showed a "capacity of medium exertion" because the

"[e]vidence received at the hearing level shows that the claimant is more limited than determined by the State agency consultants." *Id.*

Fifth, the ALJ found that, considering Ms. Hartfield's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Hartfield could perform, including fast food crew person and thrift store cashier, which would not require the performance of work-related activities precluded by her residual functional capacity. *Id.* at 42-43. The ALJ noted that Ms. Hartfield has a high school education, can speak English, has work skills from past relevant work, and that the vocational expert testified Ms. Hartfield's past relevant work as a Fast Food Assistant Manager and a Department Store Assistant Manager gave her "supervisory, scheduling, inventory, communication, report writing/record-keeping, cashiering/money-handling, and problem resolution skills." *Id.* at 43.

## IV.  STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th

Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A. The ALJ Properly Weighed the Medical Evidence and Substantial Evidence Supported His Determination of Ms. Hartfield's Residual Functional Capacity.

Ms. Hartfield stated that the ALJ erred by "fail[ing] to cite to any specific evidence in the record that supports this RFC determination" or "any specific medical facts or even any persuasive non-medical evidence that exhibits a foundation for his conclusion regarding Ms. Hartfields' [sic] RFC." ECF No. 9 at 14. Here, substantial evidence in the record supports the ALJ's decision of Ms. Hartfield's RFC. Following Ms. Hartfield's alleged onset, Ms. Hartfield saw Dr. Salumbides on January 26, 2012, where she only noted Ms. Hartfield had some back pain, slight weakness and experienced headaches earlier in the day. R. at 729-730. However, Ms. Hartfield did not feel dizzy and Dr. Salumbides did not prescribe Ms. Hartfield any medication for her back pain. *Id.* On March 30, 2012, Ms. Hartfield returned to Dr. Salumbides with mild lower back pain, but presented normal gait, coordination, and muscle tone as well as negative straight leg raising bilaterally. *Id.* at 694-96. In addition, Ms. Hartfield's neurological examinations were unremarkable on July 8 and October 4 and even though she had tenderness over the lumbosacral regions, she showed normal stance and gait. *Id.* at 679-680; 744-745. When Ms. Hartfield saw Dr. Charles on November 7, 2012, and February 11, 2013, he noted no

14

significant changes in her condition and that her neurological and musculoskeletal exams were unremarkable. *Id.* at 781, 791-92.

In addition, Ms. Hartfield's physical therapy records supported the ALJ's decision. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citation omitted). On March 29, 2013, it was noted Ms. Hartfield had been "making steady progress with aquatic therapy" and showed a slight improvement in her gait pattern. R. at 821. Ms. Hartfield self-discharged from physical therapy and her April 10, 2013 discharge summary said she had "significant improvements in mobility, endurance and strength. *Id.* at 820. When Ms. Hartfield saw N.P. Humphreys while she was undergoing therapy on April 8, 2013, Ms. Hartfield stated she was "feeling better" and that "her pain [was] resolved in her back since [her] previous visit." *Id.* at 764. The musculoskeletal and neurological examinations N.P. Humphreys performed were unremarkable and Ms. Hartfield presented with a normal gait and range of motion. *Id.* at 764-65. Therefore, there was sufficient evidence in the record to support the ALJ's determination of Ms. Hartfield's RFC.

**B. The ALJ Properly Weighed the Opinions of Dr. Charles.**

In Ms. Hartfield's summary judgment motion, she argued that the ALJ erred by not affording greater weight to the opinion of her treating physician, Dr. Charles, which resulted in an improper determination of Ms. Hartfield's RFC. ECF No. 9 at 9-14. Ms. Hartfield claimed that Dr. Charles' opinions should have been given controlling weight because they are "supported by clinical and diagnostic abnormalities documented over a longitudinal period of time and are uncontradicted by other substantial evidence in the record." *Id.* at 13. Further, Ms. Hartfield contended that even if Dr. Charles was not given controlling weight, he is "still entitled to deference" because he regularly treated Ms. Hartfield since April 3, 2012, his treatment

focused on her spinal impairment, he provided support for his opinions, and his opinions are supported by the medical records. *Id.* (citation omitted).

Under the "treating physician rule," the opinion of a claimant's treating physician should be given great weight, and may be disregarded "only if there is persuasive contradictory evidence" in the record. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *see also* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). If any of the evidence is inconsistent, the ALJ must decide which evidence should receive controlling weight. 20 C.F.R. §§ 404.1527(c)-(d), 416.927(c)-(d). The regulations do not require that an ALJ accept opinions from a treating physician in every situation, for example, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Acting Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well-supported. *Jarrells v. Barnhart*, No. 7:04–CV–411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005). The ALJ must articulate the reasons for the weight given to the treating source's medical opinions, 20 C.F.R. § 404.1527(d)(2), and specific supporting evidence must be cited so that a reviewing court can discern the basis for the decision. *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 519 (D. Md. 2002); *see also Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

Pursuant to 20 C.F.R. § 404.1527(c), unless a treating physician's medical opinion is afforded controlling weight, the ALJ must consider non-exhaustive factors, which include whether: (1) the physician has examined the claimant; (2) the physician has treated the claimant,

and the nature, extent, and length of the treatment relationship; (3) the medical opinion is supported by relevant evidence, particularly medical signs and laboratory findings; (4) the opinion is consistent with the record as a whole; (5) the treating physician is a specialist in the field of which he is opining; and (6) other factors. 20 C.F.R. § 404.1527(c)(1)-(6).[3] The ALJ is also required to articulate the reasons for the weight given to a treating source's medical opinions. *Id.* § 404.1527(d)(2).

Here, there is substantial evidence in the record to support the ALJ's decision to give "little weight" to Dr. Charles' November 2012 and March 2014 questionnaires because they are inconsistent with the other evidence in the record. *Id.* at 42. "The regulations provide that a treating physician's opinion is entitled to controlling weight only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Craig*, 76 F.3d at 590; *see also*, *Baxter v. Astrue*, No. 3:11-CV-679, 2013 WL 499338, at *4 (E.D. Va. Feb. 7, 2013) (stating that if the treating doctor's opinion is inconsistent with other substantial evidence in the record, or is not well supported by medically acceptable techniques, that opinion will not be given controlling weight); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.

Dr. Charles opined on November 7, 2012 that Ms. Hartfield could sit for one hour, then stand for one hour; needed to get up every ten minutes when sitting; could move for ten minutes before sitting again; and could occasionally lift up to ten pounds. R. at 754-761. However, on January 26, 2012, Ms. Hartfield's physical examination only showed some back pain, but that it was not significant enough to require medication. *Id.* at 729-730. On March 30, 2012, Ms. Hartfield presented for another physical examination with mild lower back pain, but presented

---

[3] The same factors and considerations in evaluating medical opinion evidence apply equally to a claimant's DBI and SSI claims. *See* 20 C.F.R. §§ 404. 1527(c)(1)-(6); *see also* 20 C.F.R. §§ 416.927(c)(1)-(6).

normal gait, coordination, and muscle tone as well as negative straight leg raising bilaterally. *Id.* at 694-96.    When Dr. Charles examined her on April 3, 2012, her neurological and musculoskeletal examinations were unremarkable with the exception that she was positive for back pain. *Id.* at 698. Ms. Hartfield's neurological examinations at the ER were unremarkable on July 8 and October 4, and even though she had tenderness over the lumbosacral regions, she showed normal stance and gait. *Id.* at 679-680; 744-745.  Given these previous findings, the ALJ had significant evidence in the record to support a finding to the contrary of Dr. Charles' November 7, 2012 opinion and to give his opinion little weight.

Likewise, the ALJ had substantial evidence to support his decision to give little weight to Dr. Charles' March 31, 2014 questionnaire where he stated that Ms. Hartfield could sit for zero to one hour; could stand or walk for zero to one hour in an eight-hour workday; could lift or carry five pounds occasionally; and had moderate limitations with using her right hand to grasp, turn, or twist objects, and with performing fine manipulations. *Id.* at 798-805. The ALJ found that Dr. Charles' increased limitations were contrary to evidence in the record that Ms. Hartfield has improved in the previous recent months. *Id.* at 42. On February 11, 2013, Dr. Charles himself noted no significant changes in her condition and that her neurological and musculoskeletal exams were unremarkable. *Id.* at 781. On March 29, 2013, it was noted Ms. Hartfield had been "making steady progress with aquatic therapy" and showed a slight improvement in her gait pattern. *Id.* at 821. Ms. Hartfield self-discharged from physical therapy and her April 10, 2013 discharge summary said she had "significant improvements in mobility, endurance and strength." *Id.* at 820. When Ms. Hartfield saw N.P. Humphreys while she was undergoing therapy on April 8, 2013, Ms. Hartfield stated she was "feeling better" and that "her pain [was] resolved in her back since [her] previous visit." *Id.* at 764. The musculoskeletal and

neurological examinations N.P. Humphreys performed were unremarkable and Ms. Hartfield presented with a normal gait and range of motion. *Id.* at 764-65. Therefore, the ALJ had significant evidence in the record to support his decision to give little weight to Dr. Charles' March 31, 2014 questionnaire.

Lastly, Ms. Hartfield argued that even if Dr. Charles was not given controlling weight, he is "still entitled to deference" because he regularly treated Ms. Hartfield since April 3, 2012. ECF No. 9 at 13. However, any error in failing to credit this opinion was harmless as there was substantial evidence in the record to counter this opinion. *See Morgan v. Barnhart*, 142 F. App'x 716, 722-23 (4th Cir. 2005). Therefore, the evidence in the record supports the ALJ's decision not to give deference to Dr. Charles' opinions.

## C. The ALJ Properly Evaluated Ms. Hartfield's Credibility in Determining Her Ability to Perform Substantial Gainful Activity.

In addition, Ms. Hartfield argued that the ALJ failed to properly evaluate her credibility. ECF No. 9 at 15-18. Ms. Hartfield claimed "[t]he ALJ's credibility determination is not supported by substantial evidence" as her use of a cane, regardless of whether it was prescribed, participation in some daily activities and lack of surgery are not significant enough reasons for the ALJ to give her testimony little weight. *Id.* at 16-18. The ALJ found Ms. Hartfield's statements regarding the "intensity and persistence of symptoms" to be not "fully credible" because "[h]er activities of daily living are extensive and certainly not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; her cane was not prescribed by a doctor; and she  has not generally received the type of medical treatment one would expect for a disabled individual" because her February 11, 2013 records showed she last

saw an orthopedist in 2010, she did not undergo back surgery, and "there is no evidence of inpatient treatment since the alleged disability onset date." R. at 41.

The ALJ's credibility assessments are to be given deference. *See N.L.R.B. v. Lee Hotel Corp.,* 13 F.3d 1347, 1351 (9th Cir. 1994) ("The ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable"); *see also Jones v. Sullivan,* 738 F. Supp. 991, 996 (E.D. Va. 1990) ("In *Shively,* the Fourth Circuit stated that '[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.'") (citing *Tyler v. Weinberger,* 409 F. Supp. 776 (E.D. Va. 1976)). Therefore, the Court's analysis is restricted to determining whether the ALJ's decision is supported by substantial evidence and whether the ALJ applied the appropriate legal standard. *Craig,* 76 F.3d at 589.

In evaluating a claimant's subjective complaints regarding pain or other symptoms, the ALJ must follow a two-step process: (1) determine whether there is objective medical evidence in the record that shows the existence of a medical impairment or impairment that could reasonably expected to produce the pain or other symptoms alleged; and (2) evaluate the intensity and persistence of the claimant's pain and symptoms and the extent to which they affect his ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *see also Craig,* 76 F.3d at 594-95; SSR 96-7p. In conducting the second step of the analysis, the ALJ is required to make a credibility determination "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *2; *see also* 20 C.F.R. § 404.1529(c)(4).

The ALJ determined that Ms. Hartfield did not meet step two because the record contained evidence that did not "corroborate the intensity and persistence of symptoms alleged

by [her]." R. at 41. Ms. Hartfield's most recent medical history revealed unremarkable musculoskeletal and neurological examinations. *Id.* at 680, 745, 764-65, 781, 791. In addition, she had a normal range of motion and normal gait. *Id.* at 696, 745, 764-65, 773, 821. Although Ms. Hartfield testified at the hearing that physical therapy did not help her condition, *id.* at 63, on March 29, 2013, her physical therapy records noted she had been "making steady progress with aquatic therapy" and showed a slight improvement in her gait pattern, *id.* at 821. She also saw N.P. Humphreys while she was undergoing therapy on April 8, 2013, and told her she was "feeling better" and that "her pain [was] resolved in her back since [her] previous visit" just six days prior. *Id.* at 764. The musculoskeletal and neurological examinations N.P. Humphreys performed were unremarkable and Ms. Hartfield also presented with a normal gait and range of motion. *Id.* at 764-65. When Ms. Hartfield discharged herself from physical therapy, her discharge summary said she had "significant improvements in mobility, endurance and strength." *Id.* at 820. All of this evidence in the record is sufficient for the ALJ to not find fully credible Ms. Hartfield's testimony of the intensity and persistence of her symptoms.

In addition, there was sufficient evidence in the record to support the ALJ's findings regarding Ms. Hartfield's limitations. The ALJ noted that he did not give Ms. Hartfield's testimony regarding the intensity and persistence of her symptoms significant weight because the cane she used was not prescribed to her by a doctor. *Id.* at 41. Ms. Hartfield argued that "[t]he ALJ erred by concluding that Ms. Hartfields [sic] testimony that she uses a cane is not credible only because there was no evidence one was prescribed by a medical source." ECF No. 9 at 17. However, Ms. Hartfield acknowledged that "[t]here is no requirement that a physician must prescribe the device or state that it is required, only evidence that there is a need for such a device." *Id.* Given that Ms. Hartfield showed a normal gait and range of motion as well as

unremarkable musculoskeletal exams, there was sufficient evidence in the record for the ALJ to find that Ms. Hartfield's testimony that she needed a cane was not credible.

Additionally, Ms. Hartfield argued that "[t]he ALJ also mischaracterized the record" of her daily activities because she relies on her husband and family members to help her and uses the NuWave to cook because she cannot open her oven door. ECF No. 9 at 17. While a claimant's ability to participate in limited household chores by itself does not prove that she has the ability to perform substantial gainful activity, the ALJ is allowed to consider these activities among other factors. 20 C.F.R. § 404.1529(c)(3). Further, evidence of the claimant's daily activities or ability to function while on medication may undermine the claim of disability. *Baxter v. Astrue*, 3:11-CV-679, 2013 WL 499338 (E.D. Va. Feb. 7, 2013). Here, the ALJ had sufficient evidence in the record to conclude that her "activities of daily living are extensive and certainly not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. at 41. Although Ms. Hartfield does rely on her husband to perform most of the housework and driving, she testified at the hearing that she can cook using a NuWave, wash clothes, load the dishwasher, drive, watch television, and shop for food. *Id.* at 61-62. Thus, this evidence in the record along with her medical history is significant enough to support the ALJ's findings regarding Ms. Hartfield's credibility as to the intensity and persistence of her symptoms.

Finally, the ALJ relied on Ms. Hartfield's course of medical treatment as evidence that her statements were not fully credible. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (noting that "an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility"); *Ledford v. Astrue*, No. 3:07-CV-1148-GRA, 2008 WL 4372778, at *3 (D.S.C. Sept. 18, 2008) (finding that "a failure to seek medical treatment may

support a finding that the claimant's allegations of disability are not fully credible"); *Dunn v. Colvin*, 607 Fed. Appx. 264, 273 (4th Cir. 2015) ("[T]his Court has long held that it is appropriate for the ALJ to consider the conservative nature of a plaintiff's treatment—among other factors—in judging the credibility of the plaintiff."). Here, Ms. Hartfield last saw an orthopedist in 2010. R. at 314. She also has only received conservative treatment for her condition, never undergoing back surgery or any inpatient treatment. *Id.* at 41. Therefore, the evidence of her lack of any treatment other than conservative treatment, her daily activities, and the lack of justification for using a cane support the ALJ's credibility determination of Ms. Hartfield.

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Ms. Hartfield's Motion for Summary Judgment or, Alternatively, for Remand, ECF Nos. 7-8, be **DENIED**, the Defendant's Motion for Summary Judgment, ECF No. 10, be **GRANTED**, the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
May 16, 2017